OPINION
{¶ 1} Appellant, Ms. Carol DiPaola, appeals the March 19, 2008 judgment of the Lake County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody to appellee, Lake County Job and Family Services. For the following reasons, we affirm. *Page 2 
 {¶ 2} Substantive and Procedural History
 {¶ 3} Ms. DiPaola gave birth to a daughter, T.B., on January 1, 2003. She has struggled with her sobriety since before T.B.'s birth and admittedly used cocaine and alcohol during her pregnancy. T.B. was diagnosed a "failure-to-thrive" baby, and has suffered from severe eating issues, an unformed spine, and gross motor delays. Her father is unknown.
 {¶ 4} Job and Family Services became involved in their lives and devised a case plan with Ms. DiPaola shortly after T.B.'s birth. The three main goals of the plan required Ms. DiPaola to provide sufficient care to meet T.B.'s medical and emotional needs, to develop her parenting skills, and to abstain from drug use. Since the plan was first implemented in early 2003, Job and Family Services has provided T.B. and Ms. DiPaola with one hundred and seventy-one hours of service. T.B. has been the agency's longest active client, and has had one hundred and sixteen separate service contacts since February of 2005.
 {¶ 5} Repeated Removals from the Home
 {¶ 6} Over the past five years, Job and Family Services has had temporary custody of T.B. four separate times due to Ms. DiPaola's struggle with sobriety and her failure to meet T.B.'s intensive therapeutic needs. Throughout this time, Ms. DiPaola has established a pattern of compliance that directly correlates with T.B.'s absence. Once T.B. is returned to her care, Ms. DiPaola relapses into drug and alcohol use and T.B.'s health declines.
 {¶ 7} Due to Ms. DiPaola's intoxication and failure to provide proper shelter for T.B. pursuant to the case plan agreement, Job and Family Services was granted *Page 3 
temporary custody for the first time in March of 2003. Job and Family Services filed for permanent custody at that time, alleging T.B. to be an abused child. The case was dismissed, although temporary custody was continued.
 {¶ 8} T.B. was placed in the foster care of the Reeves family, after a brief stay with the Hayes family while Ms. DiPaola underwent therapy for her drug use. Custody was returned to Ms. DiPaola in October of 2003, but ultimately, the Reeves have been an integral component in providing T.B. with proper care for the past five years she has been intermittently in their care.
 {¶ 9} The second removal occurred in March of 2004, after Ms. DiPaola had a drug and alcohol relapse. Several home visits from Job and Family Services raised safety concerns when Ms. DiPaola appeared visibly intoxicated while caring for T.B. The agency again filed for permanent custody, and the parties entered into a stipulated finding of dependency. During this second separation, T.B. underwent two surgeries, one in which a "G-tube" or feeding tube was inserted to enable her to receive a proper amount of nutrition, and the other to correct her unformed spine. T.B. was in the care of the Reeves family until she was returned to Ms. DiPaola in March of 2005.
 {¶ 10} The third removal occurred several months later, in June of 2005, after Ms. DiPaola was hospitalized from a drug-induced seizure. Job and Family Services filed for permanent custody in September of that year and after a four-day hearing, the motion was denied. Custody was returned to Ms. DiPaola on July 31, 2006, with the stipulation that Ms. DiPaola comply with the case plan and instructions of Job and Family Services. Ms. DiPaola, however, failed to comply and again relapsed into drug and alcohol abuse. *Page 4 
 {¶ 11} The facts leading to the fourth and most recent removal are most alarming. T.B.'s social workers testified that T.B.'s attendance in her preschool/ headstart program became sporadic beginning in January of 2007. Accordingly, Job and Family Services filed a motion to show cause and to hold Ms. DiPaola in contempt on February 5, 2007, and it was agreed that she could purge the contempt by complying with the case plan. Two months later in April of 2007, T.B. suffered an extreme sudden weight loss of over two pounds in a two week period. This weight loss was so substantial that T.B.'s health returned to a "failure-to-thrive" status.
 {¶ 12} One month later, on May 31, 2007, Job and Family Services received "shelter care" or physical custody of T.B. after they received an anonymous tip that Ms. DiPaola was in jail awaiting sentencing for deception to obtain dangerous drugs. The caller informed the agency that T.B. was in the care of her grandmother, Mrs. Ruth Bailey, without her proper feeding supplies, and that T.B. had been without her feedings for the previous two days. Job and Family Services had been unaware of the pending charges and subsequent conviction because Ms. DiPaola had revoked her authorization to release information to the agency, believing that the release of her information violated her constitutional rights.
 {¶ 13} Ms. DiPaola had been arrested in 2007 after a Lake County Narcotic agent's investigation revealed that she had obtained over 1,984 controlled substances, which included oxycodone, hydrocodone, darvocet, codeine, phenobarbital, and carisoprodol from ten different doctors and thirteen different pharmacies. She ultimately pled guilty to three counts of deception to obtain dangerous drugs, felonies of the fifth degree. *Page 5 
 {¶ 14} Ms. DiPaola's probation officer, Ms. Nicole Randazzo, testified that Ms. DiPaola was subsequently arrested for violating her probation after she tested positive for drugs in two of her urine samples. Accordingly, she was sentenced to a thirty-day jail term, followed by treatment in a drug rehabilitation program, from which she was discharged early because of her requests to leave.
 {¶ 15} The Termination of Parental Rights Hearing
 {¶ 16} This last and most recent removal prompted Job and Family Services to file for permanent custody of T.B. on July 25, 2007. A five-day hearing over a four-month span was held where the state presented evidence through the testimony of eleven witnesses, including Ms. DiPaola's and T.B.'s counselors, T.B.'s teachers and doctor, as well as Ms. DiPaola's arresting officer, and her probation officer.
 {¶ 17} The testimony of the social workers and case workers carried a common theme. While in Ms. DiPaola's care, T.B. was anxious, withdrawn, and depressed. She was physically frail, her hair was thin and "lacked luster," and at the point of the last removal, her foster mother, Mrs. Reeves, testified that her collarbones were visibly protruding.
 {¶ 18} When she was most anxious, T.B. would answer questions in the negative, repeating "I don't know. I don't know," multiple times. She would engage in repetitive, anxious behaviors such as floor pacing, flapping and waving her arms, or repeatedly singing songs or phrases to herself.
 {¶ 19} The caregivers who observed and provided guidance during the visits Ms. DiPaola had with T.B. were struck by how aggressively affectionate Ms. DiPaola was towards T.B., and the stark contrast of T.B.'s behavior, who was unable to reciprocate *Page 6 
the affection. T.B. would shrug off Ms. DiPaola's advances, indicating that she did not want to be touched or held. Ms. DiPaola repeatedly cancelled appointments, and during the appointments that were held, she often appeared disheveled and intoxicated, speaking with slurred speech. Ms. DiPaola continually resisted communicative instructions as to T.B.'s behavioral cues, believing that "mother knows best." Against the caregivers' repeated guidance, she would attempt to implement a "reverse psychology" approach in an effort to stimulate T.B.'s eating and encourage attachment.
 {¶ 20} T.B.'s early childhood mental health specialist, Ms. Phipps, testified that in the beginning of the preschool program, which T.B. began attending in August of 2006, T.B. had trouble interacting with other children. Both Ms. Phipps and her TIPS teacher, Ms. Nancy Ward, observed that T.B. was socially withdrawn and did not engage in imaginative, dramatic, or cooperative play. Her progress improved, albeit slowly during the first several months until her attendance became sporadic in January of 2007. Both testified that her progress and health improved dramatically during the summer of 2007 when she was placed in the care of the Reeves foster family. Her weight and eating issues improved to the point where her twice daily feedings could be reduced to one nightly feeding, and she began interacting and playing with the other children. Both noticed a decline in her anxious behaviors, which she seemed to display only when she was informed that Ms. DiPaola would be visiting.
 {¶ 21} As part of T.B.'s therapy, Ms. DiPaola and her caregivers in the TIPS program were required to keep a daily food log. Initially, Ms. DiPaola sent T.B. formulas and pureed foods for her school lunches. A month into the school year, however, Ms. DiPaola sent a letter instructing the school that T.B. was allowed to eat "normal" foods *Page 7 
with the other children and that she would no longer be sending food. A counselor subsequently discovered an excess of T.B.'s feeding formula in Ms. DiPaola's home, and thus, the clear inference arose that T.B. was not receiving her formula as prescribed.
 {¶ 22} Dr. Cuddy, a Cleveland Clinic psychologist, who has worked closely with T.B. since her first evaluation in October of 2005, also testified. T.B. was initially in the outpatient program, where she would visit the clinic weekly or monthly. Her visits, however, were sporadic while she was in Ms. DiPaola's care. Ms. DiPaola would frustrate easily during T.B.'s feedings, had difficulties staying calm, and refused to enter T.B. into the intensive program to which she was eventually admitted in September of 2007. Dr. Cuddy found Ms. DiPaola's daily food logs puzzling because they reported T.B. eating substances she was unable to consume, such as pork chops and steak. She overruled Ms. DiPaola's instructions to the school to provide with her regular foods; as only until recently T.B.'s diet has consisted of mostly pureed foods.
 {¶ 23} Ms. DiPaola testified in her defense, contradicting much of the testimony of the case workers and Dr. Cuddy. Specifically, Ms. DiPaola took a defensive approach to the professionals' advice in the belief that Job and Family Services was "out to get her." She denied testing positive in past toxicology screens and denied that she was intoxicated during the counselors' visits. Ms. DiPaola blames the caregivers for "interfering" with her relationship with T.B. and believes that the high anxiety T.B. exhibits during their visits together stems from the many observers that are present.
 {¶ 24} T.B.'s Guardian ad litem recommended that permanent custody be granted to Job and Family Services, finding Dr. Cuddy's testimony to be of utmost *Page 8 
significance as Ms. DiPaola has been unable to follow medical instructions to ensure T.B. gains a sustainable amount of weight. Her belief is that stability and permanency are critical to ensure T.B.'s medical needs are met.
 {¶ 25} After reviewing the evidence and recommendation of the GAL, the court issued its judgment entry on March 19, 2008, finding that it is in the best interests of T.B. that she be placed in the permanent custody of Job and Family Services.
 {¶ 26} Ms. DiPaola subsequently appealed, and raises the following assignment of error:
 {¶ 27} "The trial court erred in granting the motion for permanent custody as the court's findings are not supported by clear and convincing evidence."
 {¶ 28} Standard of Review
 {¶ 29} "It is well established that a parent's right to raise a child is an essential and basic civil right." In re Phillips, 11th Dist. No. 2005-A-0020, 2005-Ohio-3774, ¶ 22, citing In re Hayes (1997),79 Ohio St.3d 46, 48. "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." Id., citing In re Hoffman, 97 Ohio St.3d 92,2002-Ohio-5368, ¶ 14. See, also, In re Smith (1991), 77 Ohio App.3d 1,16. "Based upon these principles, the Ohio Supreme Court has determined that a parent `must be afforded every procedural and substantive protection the law allows.'" (Citation omitted.) Id., quotingHayes at 49.
 {¶ 30} "`R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing and, provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child *Page 9 
placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 31} "Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 32} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 33} "If the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the *Page 10 
juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions are enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 34} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 35} "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to *Page 11 
be established." In re Lambert, 11th Dist. No. 2007-G-2751,2007-Ohio-2857, ¶ 70-75, quoting In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368.
 {¶ 36} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." Id. at ¶ 75, citing In re Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, 8.
 {¶ 37} Clear and Convincing Evidence was Presented
 {¶ 38} In her sole assignment of error, Ms. DiPaola argues that the trial court erred by granting Job and Family Services permanent custody of T.B. because the court's judgment is not supported by clear and convincing evidence. Specifically, Ms. DiPaola argues that she is case compliant, and that permanency can be established with the agency in ways other than the termination of her parental rights. Ms. DiPaola further argues that the agency did not diligently try to reunify her with T.B, and that they did not use all the available resources in their attempts to do so. We find these contentions to be without merit.
 {¶ 39} The trial court in a well-reasoned decision supported its findings by clear and convincing evidence and arrived at the determination that it is in T.B.'s best interests to be permanently placed in the custody of Job and Family Services. Specifically, the trial court reviewed the lengthy history of this case. The court noted that Ms. DiPaola has never once completed any of the many case plans that were devised for her. She has been, since prior to the inception of this case, addicted to drugs and prescription medications. Crucially, she does not understand T.B.'s special *Page 12 
feeding issues, and most notably, T.B. only receives the intensive care and therapy she needs when she is with the Reeves family.
 {¶ 40} The court was of the opinion that "if [Ms. DiPaola] could not abstain from these substances after enduring one permanent custody hearing, then there is nothing significant to motivate her to do so, at least not in the foreseeable future. [T.B.] has waited long enough, she is entitled to have some structure and direction in her life. Mother cannot provide this. Mother is not, at the present time or at any time in the foreseeable future, capable of caring for [T.B.] or providing for her safety as she is, at present, virtually incapable of providing for herself."
 {¶ 41} In making the determination of T.B.'s "best interests," the court considered the interaction and interrelationship of T.B. with both Ms. DiPaola and the Reeves, the wishes of T.B., the custodial history of T.B., whether T.B. needed a legally secure permanent placement, and whether that type of placement could be achieved without a grant of permanent custody to the agency.
 {¶ 42} Specifically, the court found that T.B.'s relationship with Ms. DiPaola has been substantial, but tumultuous and inconsistent. While there has been significant bonding on the part of Ms. DiPaola, T.B. does not appear so attached, and instead has closely bonded with the Reeves. Indeed, when asked to draw a picture of her family, T.B. drew a picture of the Reeves.
 {¶ 43} Although T.B. is able to verbalize her wishes to remain with the Reeves, the court doubted her ability to understand the gravity and nature of the hearing because she is only five years old. The court noted that she exhibits anger and anxiety when she is removed from her foster parents, and that she has expressed to the GAL *Page 13 
that she wishes to remain with the Reeves. The court also noted that T.B. has been, throughout her young age, at least twice in the custody of the agency for a period of twelve or more months in a twenty-two month period. Finally, the court found that T.B. needs a secure, permanent, stable home, which Ms. DiPaola is unable to provide in the foreseeable future.
 {¶ 44} Though Ms. DiPaola's love for her child is evident, and while her intent may have been to comply with her case plans, a review of the evidence reveals that she has struggled to meet her own needs and that of T.B.'s since her birth. There have been three different reunifications in this case, and numerous counseling and therapeutic sessions. Over time, Ms. DiPaola has established a pattern where she would be case compliant only during the periods T.B. was not in her custody. Her compliance and efforts to stay sober would falter once mother and daughter were reunified. Thus, as Ms. DiPaola's efforts would wain over time and she would again struggle with drug addictions, T.B.'s health and behavioral needs would not be met, and T.B.'s health would suffer. Indeed, at one point, T.B.'s weight declined so dramatically she reverted back to a "failure-to-thrive" status. T.B. is a special child that needs intensive care to overcome her physical problems, and stability to form a healthy attachment to a caregiver.
 {¶ 45} Ms. DiPaola argues that she has been case compliant; however, our review reveals that Ms. DiPaola has repeatedly violated her case plans. She has missed numerous appointments for therapy and counseling for both herself and T.B. Ms. DiPaola refuses to listen to the counselors' advice on how to read T.B.'s behavioral cues, and thus there is a constant miscommunication between mother and child. Most *Page 14 
concerning are the reported food logs maintained by Ms. DiPaola, which do not seem credible and accurate in that they log types of food that T.B. is currently unable to eat, such as steaks and pork chops. In Ms. DiPaola's care, T.B.'s affect was described as "flat," and her anxious behaviors during her observed visits when she is with Ms. DiPaola at home and at school is most concerning
 {¶ 46} Once she was in the Reeves' care, however, T.B. flourished. She began to play with other children, exuded confidence, her hair became shiny and thick, and most importantly, she gained weight to the point where her feedings could be decreased. The Reeves ensure that T.B. receives the intensive treatment that is needed, and have dedicated much of their days to the care of this child. In fact, from September to December of 2007, the foster parents have worked closely with Dr. Cuddy and T.B. in the intensive feeding treatment program. This required Ms. Reeves, and occasionally Mr. Reeves, to be present for the all day program and to participate during T.B.'s meals and feedings. T.B. identifies with the Reeves, and has strong attachments to the family. She does not exhibit this type of attachment with Ms. DiPaola.
 {¶ 47} Ms. DiPaola has also failed to be case compliant as to her own mental health issues. Indeed, it was only last year that she was convicted of deception to obtain dangerous drugs. She has a high degree of anxiety, and even went so far as to revoke her authorization to release information to the agency. Thus, the agency was not even aware that charges had been raised against Ms. DiPaola, or that she was convicted and sentenced on May 31, 2007. An anonymous phone call saved T.B.'s life when the caller alerted the agency to the fact that Ms. DiPaola was in jail awaiting her sentence, and that T.B. was in the care of her grandmother, Ms. Bailey, where she had *Page 15 
spent the night without her feeding supplies. That is a dangerous situation for a "failure-to-thrive child," where constant monitoring and extreme vigilance to her care is of an utmost necessity.
 {¶ 48} Ms. DiPaola next argues that legally secure placement could have been achieved without granting permanent custody to the agency. In order to do that, the Reeves or a willing foster family would have had to petition the court to be a part of this case. Quite simply, the choice before the court was either Ms. DiPaola or the agency; thus, this argument is wholly without merit. The court cannot force the Reeves to be a part of this proceeding.
 {¶ 49} Finally, Ms. DiPaola argues that the agency did not diligently try to reunify her with T.B. Pursuant to R.C. 2151.414(E)(1), Job and Family Services is required to conduct reasonable case planning and use diligent efforts to assist the parent and prevent the child from being removed from the home. Thus, "[a]t various stages of the child-custody proceeding, [Job and Family Services] may be required * * * to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2141.414(E)(1) at a permanency hearing, the court must examine the `reasonable case planning and diligent efforts by the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time. However, the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody." In re Johnston, 11th Dist. No. 2008-A-0015, 2008-Ohio-3603, ¶ 52, quoting In re C.F.,113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 42. *Page 16 
 {¶ 50} Ms. DiPaola's argument is wholly without merit, as both T.B. and Ms. DiPaola have received intensive therapy and counseling. A remarkable amount of hours, effort, and dedication were devoted to T.B. and Ms. DiPaola. T.B. is in fact their longest active client and only one child has received more services in the same time period. There were three different attempts to reunify Ms. DiPaola with T.B. Unfortunately, all of these attempts have failed.
 {¶ 51} Ms. DiPaola takes issue with the fact that the agency did not place her in a specific program, Turning Point, which is located in Ashtabula County and houses parents and children together with twenty-four counseling and care. If the many different therapies that were offered in this case were unsuccessful, it is purely speculative that this one other program would achieve the stability, permanency, and care that T.B. needs established, and that all of the other programs have failed to do.
 {¶ 52} In this case, the agency's efforts were far more than reasonable as there have been repeated attempts to help Ms. DiPaola remain sober and help her learn how to parent a child with such special needs. Despite the agency's dedicated attempts and most diligent efforts, they were unsuccessful.
 {¶ 53} "In determining whether the agency made reasonable efforts [pursuant to R.C. 2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." In the matter of Elliot, 11th Dist. No. 2005-A-0018,2006-Ohio-738, ¶ 16, citing In re Lewis, 4th Dist. No. 03CA12,2003-Ohio-5262, ¶ 16. "`Reasonable efforts' does not mean all available efforts. Otherwise, there would *Page 17 
always be an argument one more additional service, no matter how remote, may have made reunification possible." Id.
 {¶ 54} Ms. DiPaola's argument is without merit as the court's judgment is supported by clear and convincing evidence.
 {¶ 55} We affirm the judgment of the Lake County Court of Common Pleas, Juvenile Division.
 DIANE V. GRENDELL, P.J., CYNTHIA WESTCOTT RICE, J., concur. *Page 1