[Cite as *In re N.C.*, 2023-Ohio-4265.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

IN THE MATTER OF:

N.C. AND T.C.,
DEPENDENT CHILDREN

**CASE NOS. 2023-G-0025**
**2023-G-0026**

Civil Appeals from the
Court of Common Pleas,
Juvenile Division

Trial Court Nos. 2020 JF 000124
2020 JF 000125

**O P I N I O N**

Decided: November 27, 2023
Judgment: Affirmed

*James R. Flaiz*, Geauga County Prosecutor, and *Christian A. Bondra*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024 (For Appellee Geauga County Job and Family Services).

*Barbara Martincic*, Martincic Law, LLC, P.O. Box 11, Mentor, OH 44061 (For Appellant Lauren Cochran).

JOHN J. EKLUND, P.J.

{¶1} Appellant, Mother, appeals the juvenile court's judgment granting permanent custody of her two children, N.C. (D.O.B. 5/13/2011) and T.C. (D.O.B. 4/08/2015), to Geauga County Job and Family Services ("GCJFS"). For the following reasons, the judgments of the Geauga County Court of Common Pleas, Juvenile Division, are affirmed.

{¶2} This case arose from a domestic violence incident between Mother and Father on June 15, 2020. When the police arrived, they entered the residence and saw

"an accumulation of trash, both inside and outside of the home, as well as feces on the floor. And an odor throughout the house, and in addition to that, it was obvious that the basic needs of the children weren't able to be met." In July 2020, GCJFS filed a complaint alleging that N.C. and T.C. were dependent children and moved for protective supervision of them. Mother and Father entered a plea of "true." The court granted GCJFS' motion for protective supervision. Mother had moved out of the family home. The court granted Father temporary custody of the children.

{¶3} Between July 2020 and May 2021, GCJFS worked with father to clean the home and parent the children. Under Father's care, both children still had hygiene and medical issues. N.C. and T.C. were diagnosed with autism. GCJFS did not find that their concerns for the children had been corrected over the course of the year. GCJFS moved for temporary custody of the children. On May 5, 2021, the court granted the motion. Between May 2021 and June 2022, GCJFS placed N.C. and T.C. with five foster families. In June 2022, they were placed with Carl and Ann Pace, a treatment level therapeutic foster home, where they continue to live.

{¶4} In July 2022, GCJFS moved for permanent custody. The court held a permanent custody hearing on November 29, 2022 and December 9, 2022. Witnesses provided the following testimonies at the hearing.

{¶5} Heather Martin, an "Ongoing Social Services Worker" for GCJFS, testified that she had been the children's case worker since August 2020. Ms. Martin stated that Mother's and Father's "case plan is broken down into two main concerns." First, "the domestic violence and the dysfunctional relationship between [Father] and [Mother], * * * as well as the lack of insight on both parents about their accountability and responsibility

2

and the severity of those incidents and how they affect the children." "The second concern is basically all of the resource management of the home, the home conditions, financial stability, basic needs of the children being met." She also listed ongoing concerns. Her concerns for Mother were Mother's "diagnosis of obsessive compulsive disorder" ("OCD") marked by a fear of germs that has impaired her ability to care for herself and the children. Ms. Martin's concerns for Father were his "work schedule, which was prohibiting him from being able to properly supervise the boys" as well as "the substance use by both parents for THC." Ms. Martin also noted that Mother and Father had "a general lack of parenting skills, the inability to make appropriate parenting decisions." Part of the parents' case plan involved them going to counseling and meeting with a parenting coach.

{¶6} Ms. Martin described the period between August 2020 and May 2021 – when N.C. and T.C. were living with Father. She said that Father "did maintain like the general, the issues with the trash and the feces and things in the home. But there had been ongoing concerns just for the dilapidated conditions of the home. There was a lot of work that was needed. It needed new walls, new floors. There was a piece of the roof that was caving in on the living room." Regarding the children's hygiene, Ms. Martin explained: "There was also concern with them not having adequate lunches that were being packed. It was being reported that they were in there for several days, there was things that looked to be rotted." Another one of GCJFS' concerns was "the children not having clothes that fit them, clothes that were torn, clothes that were dirty. They, themselves, had a lack of hygiene and were often dirty." After bringing these concerns to Father, he did not purchase new clothing. GCJFS eventually provided clothing to them.

3

Ms. Martin also said that Father explained that the clothes were dirty because he did not have time to do laundry. Regarding the children's medical needs, Ms. Martin said that Father stated that he did not have time within his work schedule to take the children to the doctor.

{¶7} Regarding the parents' finances, Ms. Martin testified that Father "knew how to budget, and he did have adequate income to be able to budget, but was still unable to maintain the utilities in his home." She said that Mother was unable (at that time) to maintain employment and her father paid her bills when she was living separately. Ms. Martin testified that Mother's OCD caused her distress and impaired her ability to "care for her own basic needs."

{¶8} By May 2021, Ms. Martin explained that she found removal from Father's home necessary because: (1) there had been no major progress on his case plan goals; (2) no improvements had been made to the home; (3) there were ongoing concerns for the children's hygiene and medical and dental needs; and (4) both parents had been regularly testing positive for marijuana.

{¶9} After the children had been removed from Father's care, both parents attended visitation. However, Ms. Martin testified that the children were not bonded with either parent during their visits. She explained: "There is no separation anxiety when visits are ending. * * * We just haven't seen an emotional reaction from either boy when it comes to whether or not they are going to see their parents or when they do have to end a visit with them." Ms. Martin testified that both children have become well bonded with Mr. and Mrs. Pace since being placed with them in June 2022.

4

Case Nos. 2023-G-0025, 2023-G-0026

{¶10} Regarding the parents' progress, Ms. Martin said that "the majority of the concerns we have remained relatively the same." She noted that Father used an inheritance to purchase a new home, "so the conditions of the home were no longer a concern." However, she maintained that there were still "issues" with Father's financial stability. He had not been able to afford gas or basic necessities. Ms. Martin testified that Father was unable to purchase food for himself and was living off "scraps."

{¶11} Mother had been living in an apartment for which a family member paid the rent. Mother moved back in with Father in July 2021. Mother also did not have a steady job until September 2022 nor does Mother own a vehicle. Ms. Martin said that Mother has been seeing a counselor from "WomenSafe" since March 2022 and has a "good rapport with her." Mother works on her OCD issues with the counselor.

{¶12} In "summer 2021," Father started seeing a counselor. The counselor stopped meeting with him because "when she did start to challenge him on accountability, he would then become verbally aggressive and have outbursts." Ms. Martin said that Father met with another counselor for six to seven months, but that ended because he had not paid her. Ms. Martin noted that Father currently sees a counselor from Signature Health, but the counselor does not specialize in substance abuse – which was a concern for GCJFS. One major concern Ms. Martin noted was that Mother and Father still lived together. In September 2021, there was another domestic violence incident between Mother and Father.

{¶13} Ms. Martin lastly testified that neither parent has rectified GCJFS' concerns and would not be able to do so within a reasonable amount of time. She made this

5

determination because she had worked with them for two and one half years with little improvement. Ms. Martin further explained:

> We haven't seen in any way their ability to show that they can focus directly on the boys [sic] needs and what's in their best interests. They have only focused on their own needs and wants and their own best interest. * * * They're back together. They're already having arguments between themselves with just them two in the home. They're [sic] still financial struggles. [Father] is still indicating that he can't afford basic necessities for himself, and [Mother] is just newly employed and in visits, she's using [Father's] credit card to pay for food for the boys. Neither of them have shown the ability to care for themselves let alone care for two children.

{¶14} Dr. Afsarifard, a clinical and forensic psychologist, testified next. The juvenile court referred him to evaluate the family and give recommendations for the children's best interests. Dr. Afsarifard utilized the Minnesota Multiphasic Personality Inventory for his evaluation. He described it as "a 567 item, true/false questionnaire that is used to get baselines on individuals psychological functioning. * * * and then measure them * * * on several dimensions of mental health, depression and anxiety, paranoia, anger, those kinds of issues." He said that Mother's results showed elevated levels of anger and paranoia. Father's results showed similar results with a high addiction scale. He also interviewed the family and relied on reports from GCJFS in his assessment. He stated that Father was particularly against mental health treatment and did not take blame for his actions. Dr. Afsarifard's recommendation to the court was that GCJFS should be granted permanent custody of the children.

{¶15} Peta Kerr testified that she had been working with Mother and Father as a parent coach since November 2021. Ms. Kerr's main goals with the family were "working on social, emotional development with the boys and the parents' understanding of that, being planned and prepared for visits, being prompt for visits, having a residence that

6

could appropriately provide for the boys and their needs." Ms. Kerr said that Mother improved in learning how to handle her OCD issues while parenting the children, but still had problems "bathing" and "toileting" them. Ms. Kerr testified that the most concerning moment had been her last visit at the home. Mother "was unable to get out of the house because she could not touch the door handle to exit because of germs." Ms. Kerr said that she typically has to prepare "exit plans" for children to cope when leaving their parents at visitation. But, she did not need to for N.C. and T.C. She explained, "I never heard the boys ask for more time, or when were we going to see you next, or reciprocate affection unless it was definitely led by the parents."

{¶16} Carl Pace testified that he has been N.C. and T.C.'s foster parent in a therapeutic foster home since June 2022. He said that the children are "bonded" and "attached" to him and his wife. He said that T.C. is "doing really well. He's flourishing. He's full of joy." He said he was afraid N.C. "would have a hard time integrating socially, and it had just been such a disruption for him. But he's done awesome. He's done awesome." Mr. Pace said that he and his wife intend to adopt the children if permanent custody were granted to GCJFS.

{¶17} Tamara Stachowiak testified that she has been the children's Court Appointed Special Advocate ("CASA") since August 4, 2020. Her duties were to "meet with the children at least once per month face to face. We attend IEP meetings, any kind of Court staffing, school meetings, visits with the parents, as well, sometimes." She testified that the children's needs, including hygiene and education, had not been met while they were still living with Father. However, she said that they are "thriving" with Ann and Carl Pace and have bonded with them. She testified that the Paces "have gone

7

above and beyond to look for other resources" in helping N.C. and T.C. with their autism. Ms. Stachowiak stated that an ongoing concern with the parents is their drug use. She said that Mother tested positive for cocaine in June 2022. She noted that another concern was Mother's mental health, which prevented her from touching door knobs or, in some instances, doing laundry. Ms. Stachowiak said that neither child is bonded with the parents. N.C. "has stated several times that he would like to remain with Ann and Carl." She said that T.C. refers to the Pace's residence as "my house." She also reported that "although [the children] feel safe in Ann and Carl's home, that they still would like to see the parents on weekends." Ms. Stachowiak recommended granting permanent custody to GCJFS "[b]ecause in the two and a half years that this case has opened there has been minimum progress with either parent."

{¶18} Father testified next. He explained that the children went to school with rotten food and urine soaked clothes because N.C. is a "prankster" and would swap out the fresh food and clean clothes before going to school. He said that he is bonded with his children and that "every foster home these kids have gone to, they have struggled with [T.C.] screaming for his daddy." When asked why it would be in the children's best interest to be in his custody, Father said "because of who my dad was, and because of the people that I have known through my life, I was almost a professional athlete. My dad was a recorded professional musician. Maybe some day they will get him inducted into the Blues Hall of Fame. And the people that I have exposed my children to through these connections, some of these people are the best of the best in the world." When asked about N.C.'s ADHD diagnosis, Father replied: "Ah, the ADHD, I honestly think that's a failure of the education system. I really don't think he has ADHD." Father was asked

8

about the children's current behavior and how they have improved. He said that "a lot of this bad behavior that the kids had that I struggled with was abused out of my children, beaten out of them while in foster care." Father said that even though he is divorced, Mother is living with him. However, "if she becomes disagreeable to a state where, you know, things are going to be unpleasant, just call the police and have the police remove her." Lastly, Father testified that he is seeing a counselor.

{¶19} Michelle Murphy, Mother's clinical counselor at WomenSafe, testified that she has been treating Mother since February 2022 to work on her anxiety. Regarding Mother's mental health, Ms. Murphy said that "I think she's done great. I noticed improvements in our conversations after her visits with the children. Like using less wipes, using less – being less anxious with her visits, particularly with feces and germs." But, she said that "recently, there has been a lot of sadness. So this has kind of taken over what's happening. And we recently started her timeline for trauma." Though Mother has made significant improvements, Ms. Murphy said that she needs to continue treatment and make more improvements.

{¶20} Mother testified last. Mother said that she has been attending counseling to address her domestic violence issues with Father. She said that they have also been attending parenting classes. Regarding her home's former condition, Mother explained: "I am up and down about that. The conditions were good and bad. A lot of people didn't see the good, and that to me was frustrating. So there, yes, there was an issue of the animals just deciding to kind of go wherever they want. So there was, you know, feces and that type of thing sometimes on the floor. Um, the kids also did like to make huge messes." Mother said that having the parent coach, Peta Kerr, with her during visits has

9

been a "huge help." She described one instance in which she was feeling anxious and Ms. Kerr watched the children for her "[a]nd she was great with them. She watched them for that minute. I came back downstairs, and we moved on." Regarding caring for the children, Mother said that she has taken T.C. to the bathroom three times without issue. When asked if she is bonded with her children, Mother said "Um, I think that I have a bond with them, and I believe they also have a bond with me. Um, I know this because like, well, clearly I have the bond with them."

{¶21} On January 26, 2023, the magistrate issued its decision, which recommended granting permanent custody to GCJFS. Mother and Father objected to the magistrate's decision. On July 24, 2023, the court denied the objections and adopted the January 26 magistrate's decision.

{¶22} Mother timely appeals and raises one assignment of error:

"The trial court erred by finding that evidence presented showed by clear and convincing evidence that permanent custody was in the best interest of the children."

{¶23} "It is well established that a parent's right to raise a child is an essential and basic civil right." *In re T.B.,* 11th Dist. Lake No. 2008-L-055, 2008-Ohio-4415, ¶ 29; *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Termination of parental rights has been described as "the family law equivalent of the death penalty." *State v. Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. "The rights of a parent to his or her child, while fundamental, 'are always subject to the ultimate welfare of the child.'" *In re L.M.R.*, 11th Dist. Lake No. 2016-L-096, 2017-Ohio-158, ¶ 33, citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). "[T]he termination of the rights of a

Case Nos. 2023-G-0025, 2023-G-0026

natural parent should occur as a last resort" but is authorized "when necessary for the welfare of the child." *Id.*

{¶24} "R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody." *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶ 33. The court must find: (1) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present and (2) that it is in the best interest of the child to grant permanent custody to the agency moving for custody. R.C. 2151.414(B)(1).

{¶25} A determination that it is in the best interest of the children to grant permanent custody to the children's services agency must be supported "by clear and convincing evidence." R.C. 2151.414(B)(1); *In re J.S.E.*, 11th Dist. Portage Nos. 2009-P-0091 and 2009-P-0094, 2010-Ohio-2412, ¶ 25. In applying a clear and convincing evidence standard, the evidence must "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The reviewing court examines the record to determine whether the evidence satisfies this burden of proof. *Id.*

{¶26} In this case, it is uncontested that the first prong is satisfied under R.C. 2151.414(B)(1)(d) – that the children have been in the temporary custody of one or more public children services agencies for twelve or more months of a consecutive twenty-two-month period.

{¶27} We now review whether granting permanent custody to GCJFS was in the best interest of the children. Mother argues it was not.

11

Case Nos. 2023-G-0025, 2023-G-0026

{¶28} R.C. 2152.414(D)(1)(a)-(e) lists factors the court must consider in determining whether granting permanent custody to the services agency is in the best interest of the children.

{¶29} The first factor is the children's interactions and interrelationships with their parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect them. Mother and Father both testified that they are bonded with the children and that the children are bonded with them. The caseworker and parent coach each testified that, even though Mother is bonded with the children, they do not reciprocate that affection. The children did not ask for more visiting time or when they would see their parents next. Father's relationship with the children demonstrated that they had hygiene and behavioral issues while under his care. They would consistently come to school in urine soaked clothes and would bring rotten lunches. Carl Pace testified that he is bonded with the children and that they are bonded with him. His testimony is supported by the testimony of the children's CASA, who said that they are bonded and "thriving" while living with Carl and Ann Pace. The children have not had any hygiene issues since being in temporary custody of GCJFS. Mr. Pace also testified that they intend to adopt the children if the court granted permanent custody to GCJFS. The first factor weighs in favor of granting permanent custody to GCJFS.

{¶30} The second factor is the children's wishes, as expressed directly by them or through the guardian ad litem, with due regard for the maturity of the children. Ms. Stachowiak, the CASA, testified that N.C. has stated several times that he would like to remain with the Paces. She also said that T.C. refers to the Pace's home as his house. Mother asserts that this factor weighs against granting permanent custody because N.C.

12

told Ms. Stachowiak that he would still like to see his parents on weekends. Even considering that statement, it is evident that the children's overall wishes are to remain with the Paces. This factor weighs in favor of granting permanent custody to GCJFS.

{¶31} The third factor is the children's custodial history. GCJFS admits that the children have been placed in five foster homes since being removed from Father's care. However, the children have been placed with the Paces since June 2022, which is a therapeutic foster home tailored to helping the children, especially T.C., with autism. This placement is likely permanent, as Carl Pace testified that they would like to adopt the children. This factor also weighs in favor of granting permanent custody to GCJFS.

{¶32} The last factor is the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. Father is still financially unable to provide for himself with basic necessities, including utilities and food. Mother's OCD, while improved, is still affecting her ability to care for her children. Even though Mother is seeing a counselor, her treatment is now focusing on trauma. Ms. Martin, the caseworker, testified that placement cannot be achieved without granting permanent custody to GCJFS because they have not "seen in any way [the parent's] ability to show that they can focus directly on the boys needs and what's in their best interests." Ms. Stachowiak also recommended granting permanent custody to the agency because "in the two and a half years that this case has opened there has been minimum progress with either parent." The children's need for a legally secure permanent placement cannot be achieved without granting permanent custody to GCJFS.

13

{¶33}  For the reasons stated above, there is clear and convincing evidence that the best interest factors weigh in favor of granting permanent custody to GCJFS.  The second prong of our analysis is satisfied.

{¶34}  Mother's assignment of error is therefore without merit.

{¶35}  We affirm the judgment of the Geauga County Court of Common Pleas, Juvenile Division.


MATT LYNCH, J.,

ROBERT J. PATTON, J.,

concur.