OPINION
{¶ 1} H.R., a minor child, appeals from a judgment of the Geauga County Court of Common Pleas, Juvenile Division, which granted the permanent custody of her to Geauga County Job and Family Services ("GCJFS"). For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History *Page 2 
 {¶ 3} H.R. was born on March 11, 1994, to Joyce and Leo Rumbutis, who had two older children. This instant case involves H.R. only. The couple divorced when H.R. was three years old. The children had little contact with Mr. Rumbutis since the divorce. Joyce Rumbutis married George Yopko subsequently. In 2006, Mr. Yopko left the family.
 {¶ 4} GCJFS became involved in January 2007 after receiving allegations that Mrs. Yopko suffered from severe alcoholism and the children had been left to fend for themselves. She was reported to have isolated herself in her bedroom and drank all day. The children told the social workers they had been taking care of their mother. All three children did poorly academically.
 {¶ 5} On May 23, 2007, GCJFS filed a complaint alleging the three Rumbutis children to be dependent and neglected. The agency requested protective supervision or temporary custody. On May 30, 2007, the trial court held an initial hearing and issued preadjudicatory orders granting temporary custody of H.R. to her maternal grandfather and granting the agency protective supervision of the children. Because H.R.'s brother and sister were older, the agency allowed them to remain in the mother's home.
 {¶ 6} On July 20, 2007, the court held another hearing and adjudicated the agency's complaint. The court found Mrs. Yopko's severe alcoholism impacted her ability to parent and she failed to complete her mental health assessment or parenting classes. The court adjudicated the children to be neglected and dependent and it allowed GCJFS to continue to exercise protective supervision over all three children. Because her maternal grandfather suffered from Alzheimer's, H.R. was placed in the *Page 3 
temporary custody of her maternal aunt and uncle. The agency's protective supervision of H.R.'s sister was terminated after she turned eighteen in October of 2007.
 {¶ 7} H.R. lived with her aunt and uncle between May 2007 and May 2008. From all indications, they provided a supportive and caring environment for H.R and there was a strong bond between them. After moving to her aunt and uncle's house, H.R. made progress in school, made new friends, and, although she did not like the rules imposed by them, she appeared to be happy in this living arrangement. She also began to take classes to prepare for confirmation at her aunt and uncle's church.
 {¶ 8} There was, however, an ongoing conflict between H.R.'s mother and her aunt over H.R. H.R. felt embroiled in the conflict. She was torn between her mother and her aunt, reluctant to choose one side over the other. Because of the conflict, she asked GCJFS to move her to a foster home. She told a social worker that perhaps by going to a foster home "she would be free from the conflict and just have a new family where she could visit her mother when she chose to, visit her aunt and uncle when she chose to, but not be enmeshed in the family."
 {¶ 9} Pursuant to her request, GCJFS placed H.R. in a foster home in June 2008. She was initially excited about the placement, but the relationship quickly deteriorated because of issues relating to unscheduled and unmonitored contact between H.R. and her mother. A report filed by her GAL on August 18, 2008, described an incident where Mrs. Yopko appeared one evening at the foster home without notice and took H.R. back to her house without permission from the foster parents.
 {¶ 10} The GAL's report commented that the foster parents were "sick and tired" of Mrs. Yopko's constant phone calls and her appearing at their home whenever she felt *Page 4 
like it. The GAL noted "these constant visits and telephone calls created much havoc in this placement." H.R. became unhappy with the living arrangement and decided that the placement was damaging to her. After three months, she again requested a move and the agency accommodated her, moving her to the current foster home at the end of August 2008.
 {¶ 11} H.R. is excited and optimistic about her current foster placement. The foster parents have a fifteen-and-half-year-old daughter, with whom H.R. has developed a close relationship. The foster parents appear to be very supportive and nurturing, providing H.R. the opportunity to concentrate on her own needs rather than her mother's needs. Her mother, however, caused eruptions at the foster home by cancelling scheduled telephone calls and visits, which devastated H.R.
 {¶ 12} After the agency's involvement beginning in January of 2007, Mrs. Yopko made an initial effort to comply with the case plan. She completed intensive outpatient treatment ("IOP") for her alcohol addiction. She also obtained a therapist and attended therapy regularly for a couple of months. Upon the completion of her IOP, however, she failed to follow through with the recommendations of the IOP treatment providers, as required by the case plan. After she completed therapy with her first counselor in December 2007, she did not obtain a new therapist to continue treatment until the end of February 2008. Throughout the spring and summer of 2008, her second therapist repeatedly recommended that she complete a course of in-patient treatment to treat her alcoholism, but she failed to meet this goal.
 {¶ 13} Because of a severe snowmobile accident in her childhood, the agency also recommended that she undergo some neurological testing to determine if her *Page 5 
alcoholism was partly caused by the cognitive impairment resulting from the accident. She was, however, unable to abstain from alcohol use for the purpose of undergoing the testing.
 {¶ 14} Subsequent to its finding that H. R. and her siblings were neglected and dependent, the trial court held additional review hearings in November 2007, February 2008, and May 2008. After the May 2008 hearing, the court granted temporary custody of H.R. to GCJFS. In its judgment entry, the court noted her aunt and uncle had indicated they were not available as a long term placement option and that H.R. had requested to be placed in foster care.
 {¶ 15} On July 14, 2008, the agency filed a motion for permanent custody of H.R. pursuant to R.C. 2151.413 and R.C. 2151.414. On that day, the court appointed an attorney to represent H.R.
 {¶ 16} On August 21, 2008, the court held another review hearing. In a judgment entry issued pursuant to the hearing, the court noted Mrs. Yopko continued to abuse alcohol; had not participated in counseling or AA meetings regularly; had not consistently responded to breath testing when paged; and had not followed up for psychiatric treatment. The court noted her behavior had been disruptive to H.R.'s placement in foster care. The court also found Mr. Rumbutis to have effectively abandoned the children.
 {¶ 17} In a September 17, 2008 report, H.R.'s GAL noted H.R.'s strong desire against adoption. The GAL, however, believed that if H.R. is placed in an adoptive home, she would benefit by having the motivation to invest in her own development in a much more stable family setting, which would allow her to take care of her own needs *Page 6 
instead of her mother's. She reported H.R.'s current foster home has provided such a supportive and nurturing setting. Among her concerns, however, was Mrs. Yopko's continued cancellations of scheduled phone calls and visits, which devastated H.R. and caused disruptions at her foster home. The GAL recommended GCJFS be granted permanent custody of H.R. and Mrs. Yopko's parental rights be terminated.
 {¶ 18} At the permanent custody hearing, held on September 22, 2008, H.R.'s counsel moved to dismiss the agency's motion on the ground that H.R.'s right to counsel was violated. Her counsel argued H.R. was not provided with counsel until the day GCJFS filed its motion for permanent custody, and as a result, H.R. was not able to pursue her wish for a planned permanent living arrangement. Her counsel argued that once the agency filed the permanent custody motion, the law precluded her from requesting the court for that disposition. The court denied H.R.'s motion, but it scheduled additional time to allow H.R. to present testimony from her expert in support of a planned permanent living arrangement.
 {¶ 19} At trial, held on September 22, 2008 and continued to October 20, 2008, GCJFS presented ten witnesses, including H.R.'s and Mrs. Yopko's counselors, the case workers from the agency, and H.R.'s GAL. Mrs. Yopko testified on her own behalf. H.R. presented five witnesses, including her expert, Dr. Gazley, her aunt and uncle, and her nineteen-year-old sister and her seventeen-year-old brother.
 {¶ 20} Mrs. Yopko's counselors described her alcoholic addiction was worsened by her feelings of being overwhelmed from the loss of her mother and the departure of her husband. She drank on a daily basis, isolated herself in the bedroom, and left the children to fend for themselves. H.R.'s brother and sister had to assume the adult role *Page 7 
and took care of the family. After the agency's involvement, Mrs. Yopko completed an IOP and attended individual therapy sessions for several months. She suffered a relapse and terminated the therapy sessions in December 2007. She did not obtain a new therapist until February 2008. She failed to reliably respond to pager requests for sobriety tests and on several occasions tested positive for alcohol. She also failed to comply with the other requirements of her case plan. In April 2007, she was hospitalized for intoxication. In August 2008, she was arrested for disorderly conduct due to her consumption of alcohol; she was also jailed around that time for her contempt of a court order to remain sober.
 {¶ 21} The testimony shows that despite her mother's alcoholism and inability to parent, H.R. reported a strong bond with her mother. She constantly worried about her mother and felt she needed to take care of her — she "was basically acting as a parent to [her] parent." She was devastated when her mother, after some initial improvement, started drinking again. Her GAL reported her mother would be drinking even when H.R. was visiting. Because of her drinking, she failed to come to H.R.'s birthday, which caused a great deal of emotional distress for H.R. Despite all of this, she told her GAL at one point that "no matter how bad it is," she still wanted to go back to her mother's house.
 {¶ 22} H.R.'s aunt and uncle provided a nurturing and caring environment for H.R. While living with them, she made progress in school, helped by the academic support she received at their home. She also started to make new friends. She was happy in this living arrangement, although she missed her mother. She recognized, *Page 8 
however, if she were to return to her mother she could not continue her academic progress.
 {¶ 23} Eventually, because of the constant conflict between her mother and her aunt, she felt torn between them, and requested to go to a foster home. Unfortunately, her aunt and uncle indicated they were not suitable for a long term placement option for H.R. due to the animosity and conflict between her aunt and mother.
 {¶ 24} After H.R. was placed in the foster home, she described her decision to leave her aunt and uncle's home as "the worst mistake of her life." Her mother's unexpected visits and unsupervised visitation caused disruptions in the foster home and strained the relationship. She stayed in the first foster home for only three months.
 {¶ 25} Testimony demonstrates that her current foster home is supportive and nurturing, allowing her to concentrate on her own needs. She has a very positive relationship with the entire foster family and her foster parents have indicated a willingness to adopt her.
 {¶ 26} GCJFS's permanency planning supervisor stated that H.R. has had a lot of instability in her background due to her mother's alcoholism. In the short time since the agency's involvement, she experienced four caretakers. The agency supervisor testified that "it is important and imperative that she have stability in her life so that she can continue to learn to be successful in life and have a place that she can come back to that is stable." She explained that having a home "to come back to" means if she goes to college she would have a home to come back to on breaks or for the Christmas holiday. *Page 9 
 {¶ 27} She testified that H.R. would benefit from adoption because she cannot reunify with her mother due to her alcoholism and she needs a permanent home. She testified that if the agency is granted permanent custody, H.R.'s relationship with her mother and her siblings do not necessarily have to be severed because the agency would look for an adoptive home that would allow a level of openness with her birth family. The agency supervisor believed H.R.'s current foster parents, who have indicated their interest in adopting her, would allow for that level of openness. She stated, even if adopted, H.R. could choose to continue her relationship with her birth mother once she reaches the age of majority. The witness was asked how the agency would balance the severance of ties with her birth family and H.R.'s need for permanency of the current placement. She answered that H.R.'s best interest is to maintain the stability provided by the current foster family, but the agency would address the issues of keeping her relationships with her extended family.
 {¶ 28} H.R.'s GAL testified that H.R. is very happy with her current foster family and wishes to remain there, saying "she's very tired of moving and really wants to stay in this home she's in." H.R., however, has expressed her wish not to be adopted, desiring instead to continue to have visits with her mother and siblings, even though she recognizes her mother's home is not a good environment for her emotionally or academically. The GAL recommended it is in H.R.'s best interests for permanent custody to be granted to GCJFS and Mrs. Yopko's parental rights be terminated. She opined that "[a]doption should be pursued with the current foster family giving [H.R.] time to transition and accept them as a permanent placement." She testified that H.R. had lived at five different places since the agency's involvement. Her GAL emphasized *Page 10 
her need for stability, which is best achieved with an adoption by her current foster parents.
 {¶ 29} Dr. Gazley testified on behalf of H.R. He stated she is emotionally attached to her family and worries about losing her mother. He believed even if her legal relationship is severed with her mother, she will try to resume the relationship when she turns eighteen. He felt H.R. is not ready to consider adoption as an option. He recommended setting "serious" limitations on H.R.'s contact with her mother if permanent custody is not granted. He believed H.R.'s history of out-of-home placement indicated the difficulties in her placement stemmed from the conflict between her mother and (1) H.R., (2) her caretakers, and (3) the agency staff. He stated both H.R. and her mother had in the past tried to circumvent the limitations imposed on their contact.
 {¶ 30} Dr. Gazley's report, submitted as an exhibit, contained his opinion that "H.R.'s placement changes appeared to be the result of `adults' inability to manage conflict, this conflict generally centering around [H.R.'s] mother's activity in the placement." He described the past pattern to have been "[H.R.] and the mother fueling adult conflict which eventually destroys the placement." He stated that "[e]ach new placement provides a new identity. Though this is in fact a development task of early and middle adolescence, changing placements postpones identity development." He cited the GAL's report that described H.R.'s current foster home as supportive and nurturing, allowing her the opportunity to concentrate on her own needs rather than taking care of her mother's problems. He also cited her comments that H.R. has begun to accept the boundaries set by her foster family and the agency. He stated if this *Page 11 
progress is maintained, the prognosis for her ongoing adolescence development is good.
 {¶ 31} Dr. Gazley noted that because of the strong bond H.R. has with her family, if GCJFS is granted permanent custody and proceeds to adoption, "there is a strong potential that [H.R.] will sabotage the adoption, or postpone it to the point where it becomes moot as [H.R.] approaches the age of 18." Because of H.R.'s unwillingness for adoption, he recommended continuance of the current placement and the agency's monitoring of contacts between H.R. and her mother.
 {¶ 32} Finally, H.R.'s sister testified she is interested in being considered as a placement for H.R. H.R's aunt testified that she felt at this time it was in H.R.'s best interest to be placed with someone other than her mother, because "she needs to be able to develop and grow and be healthy."
 {¶ 33} After the hearing, the court granted permanent custody of H.R. to the agency. It noted its previous findings that the agency had made reasonable efforts to prevent the removal of H.R. from her parents. The court concluded H.R. cannot be returned home within a reasonable time, because Mrs. Yopko suffered from alcoholism and she had been inconsistent with her efforts to deal with her addiction, which prevented her from providing H.R. a stable and nurturing home. She failed to regularly visit with H.R. when given the opportunity to do so and failed to participate in counseling and substance abuse treatment to address her issues. She also failed to consistently report for breath testing as required. The court found Mr. Rumbutis to have abandoned H.R. *Page 12 
 {¶ 34} While Mrs. Yopko did not appeal the court's judgment, H.R. filed the instant appeal, assigning the following errors for our review:
 {¶ 35} "[1.] Appellant's right to effective assistance of counsel was denied when the court appointed legal counsel after Geauga County Job and Family Services ("JFS") filed a motion for permanent custody.
 {¶ 36} "[2.] The trial court order granting Geauga County Job and Family Services' Motion for permanent custody was against the manifest weight of the evidence and not in the appellant's best interests.
 {¶ 37} "[3.] The trial court erred when it stated that the minor child's legal relationship with her mother and father would remain intact if the child were not adopted."
 {¶ 38} We begin with the second assignment of error, i.e., the question of whether the trial court's granting of permanent custody is supported by the evidence.
 {¶ 39} Whether Permanent Custody is Supported by theEvidence
 {¶ 40} H.R. argues the evidence shows that (1) she could be placed with her mother within a reasonable time, and further that (2) it is not in her best interest to grant permanent custody to GCJFS. Having reviewed the record, we conclude permanent custody is warranted in this case.
 {¶ 41} R.C. 2151.414 sets forth the guidelines to be followed by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(A)(1) requires the court to schedule a hearing and provide notice, upon the filing of a motion for permanent custody of a child by a public children services agency that has temporary custody of *Page 13 
the child or has placed the child in long-term foster care. In reKrems, 11th Dist. No. 2003-G-2535, 2004-Ohio-2449, ¶ 31.
 {¶ 42} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public agency if the court determines, by clear and convincing evidence, that it is in the best interests of the child to grant permanent custody to the agency, and that any of the following apply:
 {¶ 43} "(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 44} "(b) The child is abandoned.
 {¶ 45} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 46} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *."
 {¶ 47} In Krems, this court summarized the two-prong analysis required by R.C. 2151.414(B) as follows:
 {¶ 48} "R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in *Page 14 
R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interests of the child.
 {¶ 49} "If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 50} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interests. In determining the best interests of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 51} "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and *Page 15 
convincing evidence, that it is in the best interests of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present."Krems at ¶ 33-36. See, also, In re T.B., 11th Dist. No. 2008-L-055, 2008-Ohio-4415, ¶ 35.
 {¶ 52} "Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established."Krems at ¶ 36, citing In re Holcomb (1985),18 Ohio St.3d 361, 368.
 {¶ 53} Standard of Review
 {¶ 54} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." Krems at ¶ 36, citing In re Jacobs
(Aug. 25, 2000), 11th Dist. No. 99-G-2231,2000 Ohio App. LEXIS 3859, at *8.
 {¶ 55} Whether Reunification is Possible Within aReasonable Time
 {¶ 56} In support of its determination that H.R. cannot be returned home within a reasonable time, the court found Mr. Rumbutis to have abandoned H.R. and that Mrs. Yopko "failed to regularly visit with her daughter when given the opportunity to do so and has failed to consistently participate in counseling and substance abuse treatment to address the issues identified in the case plan. She failed to consistently report for breath testing when required."
 {¶ 57} The testimony indicated Mrs. Yopko was initially receptive to treatments for her alcoholism and apparently made some efforts to comply with the case plan; she completed the IOP and attended the AA meetings. However, she has not been *Page 16 
consistent in her efforts after the initial progress. After terminating her treatment sessions with her first therapist, she did not obtain a new therapist to continue her treatment for several months. She continued to binge drink while under treatment with the second therapist. Pursuant to her case plan, she was required to respond to pager requests for random alcohol testing. She failed to consistently respond to them and tested positive for alcohol on several occasions.
 {¶ 58} Despite repeated recommendations from her second therapist to undertake in-patient treatment for her alcohol addiction, she failed to do so. She was not able to abstain from alcohol for an extended period of time in order to undergo neurological testing to determine if her addiction is related to a brain injury she suffered in a childhood snowmobile accident. During the pendency of this case, she was arrested on more than one occasion for conduct relating to her intoxication. She failed to show up for H.R.'s birthday in March 2008 because of her drinking, much to H.R.'s distress.
 {¶ 59} The evidence establishes Mrs. Yopko's inconsistent efforts to treat her severe alcoholism and her inability to parent as a result of it. Given the critical need for H.R. to have a stable environment for her development, as testified to by the witnesses, we conclude the trial court's determination that she cannot be placed with either parent within a reasonable time is supported by clear and convincing evidence.
 {¶ 60} We now proceed to the second prong of the permanent custody analysis, i.e., whether it is in the best interest of the child to grant permanent custody of the child to the agency.
 {¶ 61} Best Interests of the Child *Page 17 
 {¶ 62} In deciding that granting permanent custody to GCJFS is in H.R.'s best interest, the court considered the requisite factors enumerated in R.C. 2151.414(D) as follows:
 {¶ 63} Regarding the interaction of the child with her biological family and her foster family, R.C. 2151.414(D)(1), the court found that (1) H.R.'s father had not been involved with H.R. for years and had made no effort to establish contact with her; (2) H.R. has a close relationship with her aunt and uncle, who continued to be supportive for her but do not wish to be considered as a long term placement option; (3) although H.R. expressed a desire to continue to have a relationship with her siblings, neither she nor her siblings have advocated strongly for more time together; (4) she has a strong bond with her mother and does not want to sever her relationship with her mother altogether, although she recognizes her mother's home is not a good environment for her; (5) she likes her current foster family and has developed a bond with them. Her foster parents have expressed an interest in adopting her if permanent custody is granted; and (6) her foster parents have had positive interactions with her extended family and have displayed openness to continued contact between H.R. and her extended family.
 {¶ 64} Regarding H.R.'s wishes, R.C. 2151.414(D)(2), the court found that she would like to remain in the current foster home, but is opposed to permanent custody to the agency and advocates a planned permanent living arrangement. In this connection, the court commented in its judgment entry as follows:
 {¶ 65} "The court sees no benefit to placing [H.R.] in a Planned Permanent Living Arrangement. [H.R.], with the assistance of counsel, can continue to advocate that she *Page 18 
be permitted to have contact with her natural family, and the Court has the authority to order continued contact between [H.R.] and members of her natural family so long as the Court continues to exercise jurisdiction over [H.R.'s] case and determines such contact to be in her best interests. If [H.R.] is subsequently adopted, [H.R.'s] adoptive parents would have discretion to allow continued contact between [H.R.] and members of her natural family. [H.R.] is of an age that she would have to consent to an adoption before an adoption could go forward. If [H.R.] did not trust that her prospective adoptive parents would make decisions consistent with her desire to maintain a relationship with members of her birth family, she would not have to consent to such an adoption."
 {¶ 66} "[H.R.] is 14 years old and has the maturity of a 14 year old. Her stated wishes regarding foster care and adoption have vacillated over time. At the present time, she does not wish consider the option of being adopted. She is comfortable and doing well in her current foster home. A grant of permanent custody of [H.R.] to GCJFS does not disrupt the current status quo for [H.R.], and leaves open the door for [H.R.] to reconsider her position regarding adoption if the bonds between her and the current foster home continue to develop and strengthen over time. If she `ages out' of the foster care system having been in the agency's permanent custody she will legally be in the same position she would have been in if she aged out of the foster care system in a Planned Permanent Living Arrangement. Alternatively, if she bonds with, and is subsequently adopted by, a healthy nurturing family, she could potentially benefit from the support a healthy family can provide long after a person reaches the legal age of majority." *Page 19 
 {¶ 67} Regarding her custodial history, R.C. 2151.414(D)(3), the court found that she had been in an out-of-home placement thirteen and one-half months at the time of the agency's motion for permanent custody: first with her maternal grandfather, then her maternal aunt and uncle, followed by a brief stay at a foster home, before being placed in the current foster home.
 {¶ 68} Regarding whether H.R.'s need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody, R.C. 2151.414(D)(4), the court found her aunt and uncle have been able to provide a nurturing home for her in the past but are not willing to be considered as a long term placement option. Her nineteen-year-old sister has expressed an interest in providing a long term placement, but this option is not suitable because her sister has not demonstrated the maturity or financial stability to take on the responsibility.
 {¶ 69} Analysis
 {¶ 70} "The determination of any disposition of a child is that disposition which is in the best interests of the child."In re Hitchcock (1996), 120 Ohio App. 3d 88, 102, citing Inre Baby Girl Baxter (1985), 17 Ohio St. 3d 229. "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." Id. at 103. The child's interest must be the primary and overriding concern in any child custody case. Inre Higby (1992), 81 Ohio App.3d 466, 469. After our review of the record, we have concluded clear and convincing evidence supports the court's determination that the best interests of the child in this case is best achieved by a grant of permanent custody. *Page 20 
 {¶ 71} The theme woven throughout the testimony and reports by H.R.'s social workers, counselors, GAL, and her own expert, is her need for a stable environment to grow and develop her sense of self-identify at this critical stage of her life.
 {¶ 72} Since January 2007, she has gone through four different out-of-home placements, two of the changes brought about by her mother's interference. Her uncle and aunt provided a loving and nurturing home for her. Yet she felt torn by the conflict between her mother and her aunt, and asked to be moved to foster care. Her bonding with her first foster family was sabotaged by unscheduled and unmonitored communication and visitations between H.R. and her mother. As Dr. Gazley, her own expert noted, "Each new placement provides a new identity. Though this is in fact a developmental task of early and middle adolescence, changing placements postpones identity development."
 {¶ 73} Every social worker or counselor who has worked with H.R. emphasized a paramount need for her to have a stable and nurturing environment where she can focus on her own development and be guided by caring, supportive adults, free of conflicts and tension caused by her mother. Having reviewed the evidence, we agree with the trial court that, given H.R.'s history of placement, such an environment unfortunately can only be ensured by a termination of parental rights and a grant of permanent custody.
 {¶ 74} The trial court's judgment terminating parental rights and granting permanent custody to GCJFS is supported by clear and convincing evidence. H.R.'s second assignment of error is overruled.
 {¶ 75} The Ineffective Assistance of Counsel Claim *Page 21 
 {¶ 76} H.R. recognized her mother's home is unsuitable for her but advocated a planned permanent living arrangement. At the beginning of the September 22, 2008 permanent custody hearing, her counsel made an oral motion for a planned permanent living arrangement. The court agreed to schedule additional hearing time to allow H.R. to present testimony from her expert in support of such a disposition. Dr. Gazley testified at the hearing that was continued to October 20, 2008, and his report was admitted as an exhibit. H.R.'s counsel was also allowed to make closing arguments for this disposition. In addition, the transcript reflects that the trial court engaged in a discussion with H.R.'s counsel at closing regarding the potential benefits and disadvantages of a planned permanent living arrangement.
 {¶ 77} In its judgment entry granting the agency permanent custody, as part of its R.C. 2151.414(D) best-interest analysis, the court made a finding under R.C. 2151.414 (D)(4) (whether the child's need for a legally secure permanent placement can be achieved without a grant of permanent custody) that a planned permanent living arrangement is not in H.R.'s best interest.
 {¶ 78} On appeal, H.R. does not directly argue that the court erred in not finding a planned permanent living arrangement to be in her best interests. Rather, she asserts a denial of her right to have counsel assisting her with pursuing this option. She based her argument on the Supreme Court of Ohio's decision in Inre A.B., 110 Ohio St.3d 230, 2006-Ohio-4359, which held that "after a public children services agency or private child placing agency is granted temporary custody of a child and files a motion for permanent custody, a juvenile court does not have the authority to place the child in a *Page 22 
planned permanent living arrangement when the agency does not request this disposition." Id. at ¶ 37.
 {¶ 79} Based on the holding in A.B., H.R. argues that after GCJFS filed the motion for permanent custody, the court no longer had the authority to consider her motion for a planned permanent living arrangement placement or to make such a disposition. She argues because she was not appointed counseluntil the agency filed the permanent custody motion, she was deprived of her right to effective assistance of counsel.
 {¶ 80} To assess this argument, we begin with a review of the statutes and case law regarding a planned permanent living arrangement.
 {¶ 81} "A `planned permanent living arrangement' is defined as a placement that gives legal custody to an agency without terminating parental rights and that allows the agency to make an appropriate placement, including foster care or other placement."In re A.B. at ¶ 24 citing R.C. 2151.011(B)(36).
 {¶ 82} R.C. 2151.353 and R.C. 2151.415
 {¶ 83} A planned permanent living arrangement is one of the dispositions available to the juvenile court upon an adjudication that a child is abused, neglected, or dependent. R.C. 2151.353 provides, in pertinent part:
 {¶ 84} "(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
 {¶ 85} "(1) Place the child in protective supervision;
 {¶ 86} "(2) Commit the child to the temporary custody of a public children services agency, a private child placing agency, either parent * * *. *Page 23 
 {¶ 87} "(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child * * *.
 {¶ 88} "* * *.
 {¶ 89} "(4) Commit the child to the permanent custody of a public children services agency or private child placing agency.
 {¶ 90} "(5) Place the child in a planned permanent livingarrangement with a public children services agency or private childplacing agency, if a public children services agency or privatechild placing agency requests the court to place the child in aplanned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:
 {¶ 91} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care.
 {¶ 92} "(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414 [2151.41.4] of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
 {¶ 93} "(c) The child is sixteen years of age or older, has been counseled on the permanent placement options available to the child, is unwilling to accept or unable to *Page 24 
adapt to a permanent placement, and is in an agency program preparing the child for independent living." (Emphasis added.) R.C. 2151.353.
 {¶ 94} Another pertinent statute that provides for a planned permanent living arrangement is R.C. 2151.415. That statute sets forth dispositions available to the juvenile court when a children services agency files a motion requesting disposition upon the expiration of temporary custody. R.C. 2151.415(A) requires a public children services agency that has been given the temporary custody of a child to file a motion requesting an order of disposition. The dispositions available include protective supervision by the agency, an extension of temporary custody, permanent custody, or a planned permanent living arrangement. Regarding a planned permanent living arrangement, R.C. 2151.415(C) provides:
 {¶ 95} "(1) If an agency pursuant to division (A) ofthis section requests the court to place a child into a plannedpermanent living arrangement, the agency shall present evidence
to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions for the child. A court shall not place a child in a planned permanent living arrangement, unless it finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interests of the child and that one of the following exists:
 {¶ 96} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care. *Page 25 
 {¶ 97} "(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, * * *, and the child retains a significant and positive relationship with a parent or relative;
 {¶ 98} "(c) The child is sixteen years of age or older, has been counseled on the permanent placement options available, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing for independent living." (Emphasis added.)
 {¶ 99} Finally, section (F) of the statute, which H.R. asserts to be also pertinent to her claim, provides:
 {¶ 100} "(F) The court, on its own motion or the motion of the agency or person with legal custody of the child, the child's guardian ad litem, or any other party to the action, may conduct a hearing with notice to all parties to determine whether any order issued pursuant to this section should be modified or terminated or whether any other dispositional order set forth in divisions (A)(1) to (5) of this section should be issued. After the hearing and consideration of all the evidence presented, the court, in accordance with the best interest of the child, may modify or terminate any order issued pursuant to this section or issue any dispositional order set forth in divisions (A)(1) to (5) of this section. * * *"
 {¶ 101} In re A.B.
 {¶ 102} In the Supreme Court of Ohio case cited by H.R.,In re A.B., the juvenile court granted temporary custody of four minors to a county children services board after finding them dependent and neglected. The board subsequently filed a motion for *Page 26 
permanent custody and the children's attorney filed a motion for a planned permanent living arrangement. The Supreme Court of Ohio stated:
 {¶ 103} "Pursuant to R.C. 2151.353(A)(5), the court can order a planned permanent living arrangement `if a public childrenservices agency or private child placing agency requests the courtto place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the [R.C. 2151.353(A)(5) factors] exists.'" (Emphasis in original.) Id. at ¶ 24.
 {¶ 104} The court quoted with approval the following interpretation of R.C. 2151.353(A) by the Eighth District in Inre M.W., 8th Dist. No. 83390, 2005-Ohio-1302:
 {¶ 105} "The wording of R.C. 2151.353(A)(5) is so unambiguous that we would be hard-pressed to find a clearer indication of intent. The statute states in no uncertain terms that the court may order a planned permanent living arrangement if (1) the county requests it, (2) [if] the planned permanent living arrangement would be in the best interests of the child, and (3) [if] one of the factors in subsections (A)(5)(a)-(c) exist[s]. While we understand that the best interests of the child are paramount in any custody case and that we are to liberally interpret the statutes to provide for the care and protection of the child, R.C. 2151.01(A), we cannot override unambiguous statutory language. Indeed, the juvenile courts derive their jurisdiction solely by grant from the General Assembly; thus, they do not have inherent equitable jurisdiction to determine a child's best interests. See In re Gibson (1991), 61 Ohio St.3d 168, 172. We therefore restate the law in this district to be that a court may not order a planned permanent *Page 27 
living arrangement unless it is requested by a `public children services agency or private child placing agency.'"A.B. at ¶ 32, quoting In re M.W. at ¶ 24-25.
 {¶ 106} The Supreme Court of Ohio explained at great length the undesirability of a planned permanent living arrangement and the importance of limitation on this disposition for a child adjudicated abused, neglected, or dependent. It stated:
 {¶ 107} "A planned permanent living arrangement places a child in limbo, which can delay placement in a permanent home. Because the General Assembly intended to encourage speedy placement, R.C. 2151.353 places limitations upon the use of planned permanent living arrangements." Id. at ¶ 33.
 {¶ 108} A foster relationship "lacks the permanency envisioned by the legislature." Id. at ¶ 35. "Even assuming that the children would be able to live with the foster mother until they reach the age of majority, they will `age out' of foster care. Children who age out of foster care lack the emotional support system and the financial stability of a permanent custody or adoptive relationship. Children who age out of foster care have no place to return for holidays, no permanent family to lean on as they enter the adult world. Thus, the General Assembly's grant of authority to request a planned permanent living arrangement, a temporary fix for foster children, solely to the [children services board] is in line with creating permanency and stability for these children." Id. at ¶ 35.
 {¶ 109} The court also cited the provision of R.C. 2151.415(C) (1) to explain why only an agency can request such a disposition:
 {¶ 110} "In addition, if the juvenile court were able to place the children in a planned permanent living arrangement without a request from the [children services board] then R.C. 2151.415(C)(1) would be meaningless. R.C. 2151.415(C)(1) states *Page 28 
that if an agency requests that the court place the child in a planned permanent living arrangement, the agency `shall present evidence to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions for the child.' This language indicates that a planned permanent living arrangement is to be considered as a last resort for the child, more evidence that the General Assembly's goal is to avoid allowing children to languish indefinitely in foster care."A.B. at ¶ 36.
 {¶ 111} The court concluded that R.C. 2151.353(A)(5) is unambiguous and "does not authorize the trial court to consider a planned permanent living arrangement unless the children's services agency has filed a motion requesting such a disposition." (Emphasis added.) Id. at ¶ 37.
 {¶ 112} In the instant case, as in A.B., GCJFS did not request a planned permanent living arrangement. Pursuant toA.B., therefore, the trial court was neither authorized nor required to consider that disposition.
 {¶ 113} Whether H.R. Could Have Requested PermanentPlanned Living Arrangement Before the Agency's Permanent CustodyFiling
 {¶ 114} H.R. recognizes the trial court lacks authority to consider her motion for a planned permanent living arrangement at the permanent custody hearing. She contends, however, that she could request, and the trial court could consider, a planned permanent living arrangement, before the agency filed its motion for permanent custody. She argues if she were appointed counsel before GCJFS filed for permanent custody, she would have been able to pursue that option with the assistance of counsel. *Page 29 
 {¶ 115} H.R.'s claim that she would have been authorized to file a motion for a planned permanent living arrangement for the court's consideration before the agency filed for permanent custody is without support of statutory or case law authority.
 {¶ 116} In support of her contention, H.R. refers us a recent Supreme Court of Ohio case, In re C.T.,119 Ohio St.3d 494, 2008-Ohio-4570. That case, however, does not support her proposition. There, the court adjudicated a minor to be dependent and granted temporary custody to the agency. The minor's GAL then filed a motion for permanent custody to be awarded to the agency. The trial court granted the motion. The court of appeals reversed on the ground that the GAL lacked standing to file a motion for permanent custody. The question before the Supreme Court of Ohio was whether R.C. 2151.415 (F) authorizes a GAL to file a motion for permanent custody.
 {¶ 117} The Supreme Court of Ohio reviewed two statutes, R.C. 2151.143 and 2151.414, which provide when and where a court may order permanent custody in a child welfare case. The court concluded that "[a]lthough those statutes refer to motions filed by a public children services agency or a private child placing agency, there is no language that mandates that only an agency may file for permanent custody. R.C. 2151.281(I) [statute delineating the duty of a GAL] and 2151.415(F), construed in pari materia, do provide independent statutory authority for a guardian ad litem to file a motion to terminate parental rights and to grant permanent custody."C.T. at ¶ 18.
 {¶ 118} Based on the C.T. court's reference to R.C. 2151.415(F), which allows the juvenile court, on the motion of "any party to the action," to determine whether any
disposition should be issued, H.R. argues the C.T.
case supports her contention that, as *Page 30 
a party to the action, she could file a motion for a planned permanent living arrangement.
 {¶ 119} H.R.'s reliance on C.T. is misplaced. The court in C.T. specifically stated that "no language in [R.C. 2151.143 and 2151.414] mandates that only an agency may file for permanent custody." Id. at ¶ 18. In contrast, the two statutes that provide for a planned permanent living arrangement, R.C. 2151.353 and 2151.415, specifically require that only an agency can request such a disposition.
 {¶ 120} R.C. 2151.353(A)(5) states that the court can place a child in a planned permanent living arrangement if a public children services agency or private child placing agency requests it. R.C. 2151.415(C) states that "(1) If an agency * * *requests the court to place a child into a planned permanent living arrangement, the agency shall present evidence to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions for the child. * * *."
 {¶ 121} Because of the specific restrictions placed by the statutes regarding a planned permanent living arrangement, theC.T. case does not support H.R.'s contention that any
party to a child welfare matter can move the court for such a disposition pursuant to R.C. 2151.415(F).
 {¶ 122} Furthermore, as the Supreme Court of Ohio inA.B. reasoned, to allow the juvenile court to place a child in a planned permanent living arrangement without a request from an agency would render R.C. 2151.415(C)(1) meaningless, because that statute requires that before the court issues such a disposition, the agency must "present evidence to indicate why a planned permanent planned living arrangement is *Page 31 
appropriate for the child including * * * evidence that the agency has tried or considered all other possible dispositions for the child." (Emphasis added.)A.B. at ¶ 36, quoting R.C. 2151.415(C)(1).
 {¶ 123} As the Supreme Court of Ohio stated, the strong language of R.C. 2151.415(C) disfavoring a planned permanent living arrangement indicates the General Assembly regards that disposition, which places children in limbo and allows them to languish indefinitely in foster care, as a "last resort" only. As a result, the General Assembly requires that only an agency can make such a request, and the trial court can grant it only after the agency presents evidence to show that all other possible dispositions for the child have been tried or considered.
 {¶ 124} Therefore, we find H.R.'s claim that she could have requested a planned permanent living arrangement before the agency's filing for permanent custody to be without merit. Having assistance of counsel before the agency's filing would not have made a difference. Consequently, her ineffective assistance of counsel claim is also without merit.
 {¶ 125} Finally, we note that although lacking the authority to consider or order a planned permanent living arrangement, the court did allow H.R. to present testimony and permit her counsel to make argument during the hearing in support of this disposition. After reviewing the evidence and considering her argument, the court concluded the circumstances of the evidence weighs in favor of permanent custody due to H.R.'s need for stability and permanency. Therefore, H.R. is in no way prejudiced by a lack of counsel prior to the agency's filing for permanent filing.
 {¶ 126} The first assignment of error is overruled. *Page 32 
 {¶ 127} H.R.'s Legal Relationship with Her BiologicalParents After Permanent Custody is Granted to the Agency
 {¶ 128} Finally, H.R. complains the trial court erroneously stated in its judgment entry that if she does not wish to be adopted and consequently is not adopted, she would maintain her legal relationship with her biological parents when she reaches the age of majority. She contends that the court's decision favoring permanent custody over a planned permanent living arrangement is partly based on this erroneous assumption. The portion of the judgment entry she complains of states:
 {¶ 129} "[H.R.] argues through counsel that an order placing her in Planned Permanent Living Arrangement is in her best interest. She argues in part that if she is placed in GCJFS's permanent custody and if she chooses not to be adopted, when she turns eighteen she would be without any legal status relative to her natural family. Her counsel gives, as example, that she would not be able to inherit from her natural parents under the rules of descent and distribution if the motion for permanent custody was granted.
 {¶ 130} "This is not a correct statement of what her legal status would be if she were placed in GCJFS's permanent custody and subsequently not adopted. If [H.R.] were placed in the permanent custody of GCJFS and not adopted, once she turned 18 and was emancipated, the permanent custody status of GCJFS would end and she would have the same legal status as any other emancipated 18 year old. [H.R.'s] birth parents would remain her parents of legal record. They would remain listed as her parents on her birth certificate.
 {¶ 131} "The granting of a motion for permanent custody has the effect of terminating the rights and obligations of the parents and makes the child eligible for *Page 33 
adoption without the consent of the natural parents. It does not terminate the legal recognition of the birth mother and father as the child's parents. They remain the parents of record on the child's birth records. Only the subsequent adoption of the child by an adoptive parent or parents has the effect of legally terminating the natural parents' legal status as parents."
 {¶ 132} We note that the Ohio Revised Code defines "permanent custody" as "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations." R.C. 2151.011(B)(30). See, also, Juv. R. 2(Z). "`Residual parental rights, privileges, and responsibilities' means those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C. 2151.011(B)(46).
 {¶ 133} "Permanent custody" is a statutorily created legal status. As defined by R.C. 2151.011(B)(30), it divests all parentalrights, privileges and responsibilities but does not alter the legal status of parent and child. That status can only beterminated by adoption. Therefore, the trial court is correct in recognizing that, should H.R. choose not to be adopted, once she turns eighteen and is emancipated, the permanent custody of the agency would end and her biological parents would remain her parents of legal record. The third assignment of error is without merit. *Page 34 
 {¶ 134} H.R., as a young adolescent, is at a critical developmental stage. Her social workers, counselors, GAL, and expert all agree that she needs to be cocooned in a stable and nurturing environment to allow her to grow and develop into adulthood, free of conflicts and strife brought about by her mother's severe alcoholism. Given her history of placement, such an environment, regrettably, can only be ensured by terminating the parental rights.
 {¶ 135} The trial court in this case held seven hearings over this matter. It was very much aware of H.R.'s opposition to adoption, yet it recognized her critical need for stability and permanency. Although not required to, the court allowed H.R. to present evidence in support of a planned permanent living arrangement, and in its judgment entry articulated reasons why permanent custody served her best interest. Among other reasons, the court explained that although H.R. presently opposes adoption, her stated wishes regarding foster care and adoption had vacillated over time in the past. A grant of permanent custody does not disrupt her current placement but offers her the option of reconsidering adoption in the next few years if the bonding between her and the foster family continue to develop.
 {¶ 136} For all the foregoing reasons, we affirm the judgment of the Geauga County Court of Common Pleas, Juvenile Division, granting permanent custody to Geauga County Job and Family Services.
CYNTHIA WESTCOTT RICE, J., concurs,
DIANE V. GRENDELL, J., dissents with a Dissenting Opinion. *Page 35